RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0320P (6th Cir.)
File Name: 01a0320p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

DAWN RANNALS,
      *Plaintiff-Appellant,*

                v.                                    No. 99-4267

DIAMOND JO CASINO,
      *Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 98-07545—David A. Katz, District Judge.

Argued: January 26, 2001

Decided and Filed: September 12, 2001

Before: BOGGS and MOORE, Circuit Judges; BELL,
Chief District Judge.[*]

————————————

## COUNSEL

**ARGUED:** Dennis M. O'Bryan, O'BRYAN, BAUN &
COHEN, Birmingham, Michigan, for Appellant. Kimbley A.
Kearney, CLAUSEN MILLER, P.C., Chicago, Illinois, for

————————————

[*]The Honorable Robert Holmes Bell, Chief United States District
Judge for the Western District of Michigan, sitting by designation.

1

Appellee.   **ON BRIEF:**   Dennis M. O'Bryan, Kirk Karamanian, O'BRYAN, BAUN & COHEN, Birmingham, Michigan, for Appellant.  Kimbley A. Kearney, Melissa A. Murphy-Petros, CLAUSEN MILLER, P.C., Chicago, Illinois, for Appellee.

MOORE, J., delivered the opinion of the court, in which BELL, D. J., joined.  BOGGS, J. (pp. 16-21), delivered a separate dissenting opinion.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-Appellant, Dawn Rannals ("Rannals"), filed this lawsuit against her employer, Defendant-Appellee, Diamond Jo Casino ("Diamond Jo"), asserting a claim under the Jones Act, 46 U.S.C. § 688, based upon an injury she suffered while attending a firefighting training program in Toledo, Ohio.[1] The district court granted summary judgment in favor of Diamond Jo on Rannals's Jones Act claim, holding that Rannals had failed to create a genuine issue of material fact regarding whether her injuries were caused by an unreasonably dangerous condition in her workplace about which Diamond Jo or its agents knew or should have known.

Rannals now appeals the district court's decision.  For the reasons that follow, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

_____

[1] Rannals also alleged liability for unseaworthiness, maintenance, cure, and wages under general maritime law. Rannals later abandoned her unseaworthiness claim, however, and she and Diamond Jo agreed to resolve any outstanding maintenance and cure issues between them.

## I. FACTS

Rannals works as a deckhand for Diamond Jo, a riverboat casino operating in Dubuque, Iowa. On January 11, 1998, Rannals and three other employees of Diamond Jo drove to Toledo, Ohio in a rental car provided by Diamond Jo so that they could attend a training program for firefighting from January 12-16, 1998, at the Great Lakes Region Training Center ("the training center"), which is operated by the United States Department of Transportation. Since 1996, Diamond Jo had allowed its employees to sign-up for this week-long training program and would pay its employees their regular rate of pay for the duration of the program. Additionally, Diamond Jo paid its employees' tuition costs for the program and all reasonable expenses for transportation, lodging, and food.[2] Diamond Jo did not require Rannals or any other employees to attend this training program; however, it did require completion of the program for promotions to supervisory positions, such as the lead deckhand positions.

After attending several days of classes at the training center, Rannals and her co-employees left their hotel to drive to the training center on the morning of Thursday, January 15, 1998. In her deposition, Rannals testified that, before she and her co-workers drove off that morning, some of her co-workers had to scrape ice off their rental car's windows. Rannals also stated that it was cold and drizzling on the morning of January 15, 1998, and that because of slippery and icy road conditions, she and her co-workers more cautiously drove to the training center. According to Rannals, when she and her co-workers arrived at the training center at approximately 8:30 a.m., it was "kind of icy on the driveway" of the training center and the surrounding grassy areas. J.A. at 81.

---

[2] If an employee did not pass the training course, resigned, or was terminated from Diamond Jo less than one year after completing the training program, however, that employee had to reimburse Diamond Jo for all tuition costs and expenses for transportation, lodging, and food. J.A. at 148.

Data prepared by the National Oceanic and Atmospheric Administration regarding the weather conditions in Toledo, Ohio, on January 15, 1998 corroborated Rannals's observations, confirming that freezing rain and trace precipitation fell between the hours of 1:00 a.m. and 9:00 a.m. on January 15, 1998 and at no other time during that day and that it was misty between the hours of 1:00 a.m. and 5:00 p.m. on January 15, 1998. The data also showed that it was below thirty degrees Fahrenheit on January 15, 1998. Joint Appendix ("J.A.") at 152-59.

Once classes ended at approximately 4:00 p.m. on January 15, 1998, Rannals and her co-workers walked out onto a grassy area bordering one of the driveways of the training center to make plans for the evening with other program attendees. Rannals testified that the conditions on the training center's property at that time were "generally the same as when [she and her co-workers] had arrived at the school that morning."[3] J.A. at 94. After Rannals finished discussing evening plans with the other program attendees, she turned around to walk toward her group's rental car. According to Rannals, as Rannals stepped off the grass and onto the training center's driveway, she slipped on a patch of ice, fell, and fractured her ankle. Rannals testified that, after she slipped, she remembered seeing "a thin layer [of ice] . . . where [she] fell." J.A. at 92. Prior to Rannals's accident, no employee at Diamond Jo, including Rannals, had complained to Diamond Jo about unsafe conditions at the training center, nor had any supervisor from Diamond Jo observed any unsafe conditions at the center.

## II. ANALYSIS

Rannals argues that the district court erred in granting summary judgment because it erroneously applied the defense of natural accumulation, a common-law defense under Ohio

---

[3]Rannals also stated that such conditions had not changed by lunchtime, asserting "I think it was pretty much as it was that morning. I do not think anything really changed." J.A. at 82.

---

Assuming that under *Empey*, and favorably construing the facts, Rannals could be found to be acting within the scope of her employment, this only adds to the irony of the court's conclusion. Apparently, if Diamond Jo had given Dawn Rannals no wages during her week in Toledo and refused to pay her tuition or travel expenses, the court would not hold Diamond Jo liable for this accident. The court punishes Diamond Jo in the name of safety for subsidizing the safety training of its employees and for its investment in the greater safety of the vessel and the employee's fellow seamen.

Because there is *no* negligence by Diamond Jo, and because DOT was not the ship's agent under *Sinkler*, Diamond Jo can only be liable for failure to provide a "safe workplace." It is unreasonable to construe the school as a "workplace" and even if it were so construed, whether it is "safe" should not be assessed under the Jones Act rules, but rather by the standard of care of which the third party was aware. The court's rule allows recovery where *no party has been negligent* under the law as it could be known to them. Diamond Jo is aware of the Jones Act rules on negligence, and it abided by them. DOT was aware of Ohio's rules of negligence, and it abided by them. Had DOT actually accepted the role of an agent of a Jones Act employer, it should be deemed to be governed by FELA rules, but otherwise it should not lose the defenses on which it reasonably relied, and which Diamond Jo had no notice were inapplicable. I respectfully dissent.

---

federal standards of care, in derogation of the laws of the several states.

apparently, *chooses* to go) would also create liability for the employer.

Even if we should consider the parking lot of the school to be a workplace, our precedents would not require abrogation of all common-law defenses of the *third party* to negligence under the *Shenker/Empey* workplace doctrine. The citation of the *Chesapeake* case, *supra* at 14, regards *direct* liability of the employer. There are two ways that the employer can breach his duty to provide a safe workplace on the premises of others. He can be on notice of an unsafe condition and fail to take reasonable care. He is stripped of his common-law defense if he breaches this duty. However, the court agrees this situation does not pertain, making *Chesapeake* only indirectly relevant. If instead the breach of the duty occurs through imputation, it is less clear that common-law defenses are irrelevant. Combining the two doctrines (for which the court has no obvious precedent) is unwarranted and pernicious. If the third party is in compliance with its jurisdiction's common-law negligence rules, the ship will be unable to maintain a subsequent action against that third party. Any attempt by either the third party or the ship to monitor the third party – where operational activities are not implicated – would be prohibitively cumbersome, particularly given the requirement that the shipowner be aware of the differing standards of care prevailing wherever it does business.[1]

---

[1] Even supposing that there were the need to create a hybrid rule of imputed liability in order to assist Jones Act plaintiffs, the court's would seem a poor one. A better alternative, one equally consistent with admiralty precedent and policies, would allow the seaman to maintain an action against his employer if the third party would be negligent under the *local* standards. This allows immediate recovery by the employee, without the necessity of his proceeding in an inconvenient and foreign forum, but it eventually shifts the cost to the responsible party, rather than leaving the employer "holding the bag" as absolute insurer. Further, it better balances state and federal interests involved in a choice of law. *See Steelmet, Inc. v. Caribe Towing*, 779 F.2d 1485, 1488 (11th Cir. 1986) (stating that if "there is an admiralty-state conflict, comparative interest must be considered"). The court's rule provides an incentive for shipowners to attempt to compel all those with whom they do business to adhere to

law, to her federal Jones Act negligence claim. Rannals contends that, as a result of applying the defense of natural accumulation, the district court erred in concluding that she had failed to create a genuine issue of material fact regarding whether Diamond Jo or its agents were negligent in failing to remove alleged dangerous conditions caused by ice in the training center's driveways.

We review de novo a district court's order granting summary judgment. *See Richardson v. Township of Brady*, 218 F.3d 508, 512 (6th Cir. 2000). On review of a district court's grant of summary judgment, we analyze the evidence and draw all reasonable inferences therefrom in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In particular, when we review a grant of summary judgment involving claims under the Jones Act, we are mindful of the "'policy of providing an expansive remedy for seamen'" who are injured while acting in the course of their employment and recognize that the "'submission of Jones Act claims to a jury requires a very low evidentiary threshold.'" *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes Steamship Div.*, 891 F.2d 1199, 1205 (6th Cir. 1989) (quotation omitted); *see also Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001). We affirm a grant of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

After careful review, we conclude that the district court erred in determining that Rannals failed to create a genuine issue of material fact regarding whether her injuries were caused, in whole or part, by Diamond Jo or its agents' failure to cure or eliminate an unreasonably dangerous condition in her workplace about which Diamond Jo or its agents knew or should have known. The Jones Act provides a cause of action in negligence for "[a]ny seaman" injured "in the course of [her] employment." 46 U.S.C. App. § 688(a); *see also*

*Chandris, Inc. v. Latsis*, 515 U.S. 347, 354 (1995).  Workers who satisfy the definition of seaman under the Jones Act "may recover under the Jones Act whenever they are injured in the service of a vessel, regardless of whether the injury occurs on or off the ship." *Chandris*, 515 U.S. at 360; *see also Daughenbaugh*, 891 F.2d at 1203.  "Proof of negligence (duty and breach) is essential to recovery under the Jones Act," and an employer's conduct in a Jones Act case is reviewed "under the 'ordinary prudence' standard normally applicable in negligence cases."  *Perkins*, 246 F.3d at 598 (citing *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997)).  Once a plaintiff proves an employer's negligence, however, she need only show that her "employer's negligence is the cause, in whole or part, of [her] injuries."  *Id.*  In other words, once negligence is established, the plaintiff need only show that her employer's negligence "played any part, even the slightest, in producing the injury or death for which damages are sought."  *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 506 (1957); *see also Perkins*, 246 F.3d at 598.

Furthermore, as the Supreme Court noted in *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424 (1939), the Jones Act was intended to expand – not limit – protections for seamen, and usually disallows "the application of rules of the common law which would affect [seamen] harshly."  *Id.* at 431; *see also Daughenbaugh*, 891 F.2d at 1204 (holding that the Jones Act "'is entitled to a liberal construction to accomplish its beneficent purposes'") (quotation omitted).  In other words, in Jones Act cases, an "employer is [generally] stripped of [its] common-law defenses."  *Rogers*, 352 U.S. at 507-08.  For example, while the doctrine of comparative negligence is applicable to claims under the Jones Act, the assumption of risk doctrine may not be used as a defense to such claims.  *Chesapeake & Ohio Ry. Co. v. Newman*, 243 F.2d 804, 807 (6th Cir. 1957); *see also Socony-Vacuum Oil Co.*, 305 U.S. at 429-31.

Moreover, the Jones Act "incorporates the standards of the Federal Employers' Liability Act ["FELA"] . . . which renders

liability in *Empey* appears to recognize two bases for such liability").  On the one hand there are *Sinkler* agency cases, on the other hand, there is the employer's own non-delegable duty to provide a safe workplace.  The court's opinion discusses both theories, but without showing that Rannals has stated a claim under either.  *See, e.g., supra* at 12, in which the court states that Diamond Jo is responsible for "the negligence of its agent, in this case, the training center[,]" but then immediately turns to a discussion of Diamond Jo's alleged breach of *its own* duty to provide a safe workplace.

The Department of Transportation is not the agent of Diamond Jo Casino.  "The law of agency is fully applicable in admiralty."  1 ADMIRALTY § 5-2, at 175.  As the court is fully aware, the mere fact that a contract exists between two parties does not make one the agent of the other.  And although an employer *may* be liable for the negligence of its independent contractor under the Jones Act, it has never been suggested that the mere existence of a contractual relationship with the employer *mandates* indirect liability.  The DOT provided a service to Rannals, subsidized in her case by Diamond Jo, but did not thereby become Diamond Jo's agent (or that of any of the other similarly situated shipowners), because it was not performing any duties or operations of the vessel.  *Sinkler* and its progeny do not allow an agency to be created where neither party had the intent to create one.

Although the court continually calls the DOT Diamond Jo's agent, it fundamentally appears to rely on the duty of a FELA/Jones Act employer to provide a safe "workplace." This requires showing that not only was Rannals "working" but that she was at a "workplace," which are not the same thing.  As seaman Salamon was walking along the dock, one could argue he was still at his "workplace," 751 F. Supp. at 345, but the *Salamon* court did not suggest that the store where he was going was equally his workplace.  In *Empey*, where the hotel was an integral part of the defendant's operation by providing housing, it was plausible to include it as part of the workplace.  By contrast, if payment of tuition can establish the individual is working at a workplace, then a college or maritime academy where the employee is sent (or,

Not one of the conditions deemed relevant in *Salamon* pertains in this case. Rannals was not fulfilling a "responsibility," the ship had no possible notice of the conditions, and Rannals was several thousand times further away from her ship than Salamon was from his. We should not impose an "unreasonable" duty not only to inspect the entire route, but also to require the shipowner to inspect the grocery store as well (where the ship might well have "contracted" for supplies). Certainly, the distance of the "store" and any familiarity the ship's master or owner might have with it cannot be simply irrelevant to what employer precautions are deemed "reasonable" (i.e., are cost-justified). Moreover, under the court's theory, as between the seaman picking up supplies and his ship, the safety condition of the store would not be judged under the well-developed *state law* on slip-and-fall, but under the more exacting standards of the Jones Act. As in this case, such a "duty" bids fair to allow a negligence action to proceed – despite the absence of any negligence.

## I

Our standard of review in this case is the normal one applicable to summary judgment. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997) (en banc), makes clear that although the requirement of proximate cause is loosened for seamen, they retain the burden of producing sufficient evidence for a rational trier of fact to find in their favor under this relaxed standard. The district court in this case, as well as our opinion, accepts *Gautreaux*. This makes clear that all our statements about relaxing the plaintiff's burden have solely to do with the level of causation, and not with the quantum of *evidence* of that minimal causation that the plaintiff must produce to survive summary judgment.

As there is *no* evidence of direct negligence, plaintiff's claim must proceed under a theory of imputation. Two possible bases for imputing liability in these circumstances were discussed in *Empey*. *See Consolidated R.R. Corp. v. Ford Motor Co.*, 751 F. Supp. 674, 679 (E.D. Mich. 1990) (noting that the "Sixth Circuit's discussion of imputed

an employer liable for the injuries negligently inflicted on its employees by its officers, agents, or employees." *Hopson v. Texaco, Inc.*, 383 U.S. 262, 263 (1966) (internal quotations omitted); *Perkins*, 246 F.3d at 598; *Daughenbaugh*, 891 F.2d at 1204; *see also Epling v. M.T. Epling Co.*, 435 F.2d 732, 736 (6th Cir. 1970), *cert. denied sub nom. Fahrig v. Young*, 401 U.S. 979 (1971). Under the FELA, an employer has a non-delegable duty to provide a safe workplace for its employees. *Payne v. Baltimore & Ohio R.R. Co.*, 309 F.2d 546, 549 (6th Cir. 1962), *cert. denied*, 374 U.S. 827 (1963).

In sum, to survive summary judgment in this action, Rannals had to create a genuine issue of material fact regarding whether (1) she was a seaman; (2) she was acting in the course of her employment at the time she suffered her injury; and (3) Diamond Jo or its agents played any part in causing Rannals's injury. Because the parties do not dispute that Rannals is a seaman, we need only address whether Rannals was acting in the course of her employment at the time of her injury and whether the negligence of Diamond Jo or its agents "played any part, however slight, in producing" Rannals's injury. *Perkins*, 246 F.3d at 598.

## A. Course of Employment

As the district court suggested, we believe that Rannals established a genuine a genuine issue of material fact regarding whether she was acting in the course of her employment when she was walking toward her car at the training center on January 15, 1998. Although Rannals and her co-workers were not required to attend the training program in Toledo, we believe that their attendance and participation were in furtherance and to the benefit of Diamond Jo's business. *See, e.g., Daughenbaugh*, 891 F.2d at 1206 (holding that a seaman was "on [his employer's] business while returning from shore leave, because shore leave for the crew is beneficial and *necessary* to [the employer's] continued operation"); *see also Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129, 132 (1959) (holding that employer may be liable for seaman's injuries where that

seaman has been sent off ship to perform duties in furtherance of the employer's business). In fact, as Rannals asserted in her deposition, deckhands at Diamond Jo could not advance into supervisory positions, such as the lead deckhand positions, without such training. Additionally, as Rannals asserted, the deckhands at Diamond Jo were encouraged to attend such training by current mates who had previously attended the program. As this circuit has recognized, "[i]t would violate the notions of fair play for [an employer] to encourage its employees to [perform a particular activity away from its premises] and then escape liability for injuries suffered by its workers as a result of the poor quality of the facilities it encouraged them to use." *Empey v. Grand Trunk W. R.R. Co.*, 869 F.2d 293, 295 (6th Cir. 1989) (quotation omitted).

Furthermore, the record indicates that Diamond Jo itself believed it had an interest in and benefitted from its employees' participation in the training program. For instance, the evidence shows that Diamond Jo paid its employees their regular wages while they attended the program. *See Shenker v. Baltimore & Ohio R.R. Co.*, 374 U.S. 1, 6 (1963) (holding that a seaman was acting in the course of his employment although he was performing services for another company because such seaman "was at all times paid by [his employer] and under [his employer's] sole supervision"). The evidence also reveals that Diamond Jo paid the costs for attending the training program and that an employee who left Diamond Jo within one year of attending the training program would have to reimburse Diamond Jo for all tuition costs and expenses for transportation, lodging, and food. Lastly, the evidence suggests that Diamond Jo considered its employees to be under its supervision while at the training center, as shown by the fact that Rannals called Diamond Jo at the end of each day's session during the training program to report the events at the training center to Diamond Jo. In sum, in light of Diamond Jo's actions in paying its employees their wages during the program, absorbing the attendance costs for the program, requiring completion of the program as a stepping stone to supervisory

With regard to training at the DOT facility, however, the situation is much different, and both law and policy counsel a different result. Diamond Jo was simply taking advantage of a DOT program provided to shipowners generally – it was not using the DOT to carry out its operational activities, nor did it have a duty to provide this training to low-level employees (a duty that carries with it the concomitant duty of non-negligent provision). Similarly, the activities of Ms. Rannals or the other trainees were not "operational" because they were not imposed as duties of employment (indeed, the accident did not even occur in the course of the training itself). The employer did not require the fire safety training any more than it might have "required" attendance at the merchant marine academy, or a Master's license, for even higher positions on the ship than the one sought by Rannals.

Even when an employee is acting within the scope of his employment, he is not necessarily at his "workplace." And while a Jones Act employer has extensive liability, it is not an absolute insurer for everything that may happen to an employee off of the employer's premises. When the employee is not engaged in "operational activities," the employer's duty to provide a reasonably safe place to work does not reach further than the ship, the employee's usual location of work, and the means of egress and ingress to those locations. 1 ADMIRALTY § 6-21, at 325. Although I have been unable to identify a case that extends employer liability as far as the court has done here, a somewhat similar situation was presented by *Salamon v. M/V Poling Bros. No. 11, Inc.* 751 F. Supp. 343 (E.D.N.Y. 1990). Salamon was the ship's cook, and left the vessel to obtain groceries in order to prepare the evening mess. He traveled down the dock some 300 feet to the stair, where he slipped and fell. *Id.* at 344. Salamon's Jones Act negligence claim survived a motion for summary judgment, but only because the cook had to use that exit to fulfill his responsibilities, the officers of the ship were familiar with dark stairway, and it was "only some 300 feet away." The court made clear that "it would be unreasonable to impose a duty on Poling to inspect plaintiff's route all the way to the grocery store and back and to take precautions over the entire way." *Id.* at 345.

---

**DISSENT**

---

BOGGS, Circuit Judge, dissenting. I respectfully dissent from the court's opinion in this case, because the DOT training program was not, in any relevant sense, Diamond Jo's *agent* in providing the facilities and parking lot in which Ms. Rannals's accident occurred. The court acknowledges that Diamond Jo was not directly negligent, in any way, in choosing the United States DOT training program, or in subsidizing Rannals's attendance. *Under the law that applied to it*, the law of Ohio, DOT also was not negligent in providing the parking lot and in not preventing the natural accumulation of snow and ice. Thus, all of the relevant parties – omitting any mention of plaintiff Rannals – were acting non-negligently under any law of which they had notice. Under admiralty law, as well as ordinary tort principles, no liability should attach to the *M/V Diamond Jo.*

The cases primarily relied on by the court are fully distinguishable, because they involve third parties performing the "operational activities" of the ship, a term of art under FELA and the Jones Act. *See* THOMAS J. SCHOENBAUM, 1 ADMIRALTY AND MARITIME LAW § 6-21 (3d ed. 2001). Shipowners are under a duty to provide medical care to seamen, and if they hire someone to perform their own duties, it is reasonable to impute any negligence to them, so that they cannot avoid their liabilities by outsourcing provision of mandatory services. For the same reason, such agents should be held to the same standard of care. *Empey* is equally distinguishable on this ground, because the railroad was required by statute to provide housing for its off-duty employees. *See Empey v. Grand Trunk Western R.R. Co.*, 869 F.2d 293, 294 (6th Cir. 1989). For similar reasons, the law does not allow evasion of Congressional protection by having employees carry out the "operational activities" of the employer on the premises of another. *Sinkler v. Missouri Pacific R. Co.*, 356 U.S. 326, 332 (1958).

---

positions, and listening to reports of the events at the center, we conclude that Rannals established a genuine issue of material fact regarding whether she was acting in the course of her employment at the time of her injury.

## B.  Negligence/Imputation of Negligence

We conclude that the district court erred in determining that Rannals failed to create a genuine issue of material fact regarding whether her injuries were caused, in whole or part, by Diamond Jo or its agents' failure to cure or eliminate an unreasonably dangerous condition about which Diamond Jo or its agents knew or should have known. Specifically, we conclude that the district court erred by holding that any negligence on the part of the training center could not be imputed to Diamond Jo and by applying the defense of natural accumulation to defeat Rannals's claim.

Under the FELA and the Jones Act, an employer has a duty to provide a safe workplace for its employees. To recover for injuries caused by the alleged negligence of an employer under the Jones Act, a plaintiff must show that her employer failed to provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure caused the plaintiff's injuries and damages. *Perkins*, 246 F.3d at 599 ("It is a fundamental principle that, under the Jones Act, an employer 'must have notice and the opportunity to correct an unsafe condition before liability will attach.'") (quoting *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993)); *see also Sinclair v. Long Island R.R.*, 985 F.2d 74, 76 (2d Cir. 1993). In so doing, the plaintiff must show "actual or constructive notice to the employer of the defective condition that caused the injury." *Sinclair*, 985 F.2d at 77; *see also Perkins*, 246 F.3d at 599.

We believe that Rannals has submitted evidence sufficient to create a genuine issue of material fact regarding whether Diamond Jo was negligent in failing to cure the conditions that caused her injuries. At the outset, we note that Rannals has successfully created a genuine issue of material fact

regarding whether any negligence by the training center in failing to cure the conditions that caused Rannals's injuries may be imputed to Diamond Jo. As the Supreme Court and this circuit have recognized, a third party's negligence in providing a safe workplace for an employer's workers may be imputed to the employer where that third party has a contractual relationship with the employer and the employee is acting in the course of her employment on the third party's premises. *Hopson*, 383 U.S. at 264; *Sinkler v. Missouri Pac. R.R. Co.*, 356 U.S. 326, 331-32 (1958); *Epling*, 435 F.2d at 736; *Payne*, 309 F.2d at 549.

In this case, we believe that Diamond Jo had a contractual relationship with the training center, which resulted in making the training center an agent of Diamond Jo and, in turn, exposed Diamond Jo to liability under the Jones Act for any potential negligence by the training center in failing to provide a safe workplace for Diamond Jo's employees. *See, e.g., Hopson*, 383 U.S. at 264 (holding that an employer was liable for the negligence of a taxi service it hired to transport two ill seamen). In fact, we believe that Rannals's case is analogous to those negligence lawsuits brought by seamen who have suffered injuries as a result of the alleged negligence of medical providers who were selected by the seamen's employers. In those cases, federal courts, including this circuit, have consistently recognized the principle that a "shipowner is liable for the negligence of an on-shore physician *that it hires to treat a crewman.*" *Olsen v. American S.S. Co.*, 176 F.3d 891, 895 (6th Cir. 1999) (emphasis added); *see also De Centeno v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 140 (5th Cir. 1986); *Fitzgerald v. A.L. Burbank & Co.*, 451 F.2d 670, 680 (2d Cir. 1971); *Maritime Overseas Corp. v. United States*, 433 F. Supp. 419, 421-22 (N.D. Cal. 1977), *aff'd in part and rev'd in part*, 608 F.2d 1260 (9th Cir. 1979). *Cf. SeaRiver Maritime, Inc. v. Industrial Med. Servs., Inc.*, 983 F. Supp. 1287, 1298-99 (N.D. Cal. 1997). In so doing, these federal courts have treated agreements between shipowners and doctors as contracts under which the doctors were agents of the shipowners and the shipowners were exposed to possible

### III. CONCLUSION

In conclusion, we hold that Rannals created a genuine issue of material fact regarding whether she was acting within the course of her employment at the time of her injury on January 15, 1998; whether Diamond Jo or its agents, specifically the training center, breached a duty to provide a safe workplace for Diamond Jo's employees by failing to cure icy road conditions on the training center's driveway; whether Diamond Jo and the training center had entered into a contractual relationship as a result of Diamond Jo's payment of its employees' tuition costs and such employees' participation in the training program; and whether the training center's negligence, if found, may be imputed to Diamond Jo as a result of their contractual relationship. For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

defense of natural accumulation can bar a seaman's Jones Act claim. Indeed, we believe that Rannals's case is extremely similar to *Chesapeake & Ohio Ry. Co.*, in which this court held that the question of whether an employer was negligent in failing to illuminate and salt a pathway to its ship that was often snowy and icy during the winter was a proper question for the jury. *Chesapeake & Ohio Ry. Co.*, 243 F.2d at 808-10. In so doing, this court in *Chesapeake & Ohio Ry. Co.* rejected an argument by the employer that is analogous to the natural accumulation doctrine, stating "[w]e find without merit the contention of the employer . . . that the employer owed no duty to keep the *entire ninety acres* free of snow and ice because it would be impossible to do that." *Id.* at 808. Moreover, as the Supreme Court has long acknowledged due to the remedial purpose of the Jones Act and its expansive breadth of protections, employers are generally stripped of their common-law defenses in Jones Act cases. *Rogers*, 352 U.S. at 507-08 ("The employer is stripped of his common-law defenses" and usually there is a only "single question whether negligence of the employer played any part, however small, in the injury."). We find no reason to make an exception for the defense of natural accumulation under Ohio law and thus bar Rannals's negligence claim.[6] In sum, we believe that the district court erred in granting summary judgment on Rannals's negligence claim under the Jones Act.

---

[6] We recognize that a direct negligence claim against the managers or supervisors at the training center who failed to cure or eliminate the allegedly dangerous, icy conditions would be governed by the Federal Tort Claims Act, 28 U.S.C. § 1346(b), which requires the application of state law to tort claims brought against the United States Government (in this case, Ohio law), because the training center was managed and run by the United States Department of Transportation. *See Federal Express Corp. v. United States Postal Serv.*, 151 F.3d 536, 541 (6th Cir. 1998). This does not, however, mean that Ohio law applies in the analysis of whether Diamond Jo would be liable for the negligence of its agent, the training center (if so found), under the Jones Act. To require the application of Ohio law in such determination would effectively render the Jones Act meaningless and would allow employers to circumvent Congress's intention to provide an expansive remedy to seamen under the Jones Act.

liability for the actions of such agents. *See, e.g., Fitzgerald*, 451 F.2d at 680.

In our opinion, much like the employers in the medical providers cases, there is evidence that Diamond Jo entered into a contractual relationship with the training center when it chose the training center to teach its employees firefighting skills, made the arrangements for its employees to attend the training program,[4] and paid the training center for such services,[5] and the training center accepted such work by accepting Diamond Jo's employees into its seminar and allowing them to attend its courses. Indeed, we believe that, based upon past dealings when Diamond Jo sent twelve employees to attend the same firefighting seminar in Toledo in both 1996 and 1997, Diamond Jo and the training center had developed an understanding that Diamond Jo would send its employees to learn valuable firefighting skills at the seminar and that the training center would train and teach such employees in a safe work environment. *See SeaRiver*, 983 F. Supp. at 1298. Although we recognize the difficulty that Diamond Jo, a riverboat casino business operating in Iowa, faces in monitoring the safety of its employees who are attending a seminar out of state in Ohio, we do not believe that such difficulties exempt Diamond Jo from liability for the actions of its agents. Rannals and her co-workers were acting in the course of their employment while attending the training program and thus were entitled to have Diamond Jo provide

---

[4] Rannals asserted during her deposition:
Q: And who made the arrangements for you to attend the school?
A: The boat, Kevin Stier or the captains.
J.A. at 132.

[5] Rannals asserted during her deposition:
Q: And was there a fee for going to the school?
A: No, other than our time.
Q: Okay. So you did not have to pay the school anything –
A: *No, not out of my pocket.*
Q: – to go there?
A: No.
J.A. at 135 (emphasis added).

a safe workplace in which they could perform their jobs, including a safe place in which to arrive at and exit from work. As we previously noted in *Payne*, if an employer "delegate[s] and relies upon the services of its agent to carry out its own duty, it may not shift its liability from itself to said agent when an employee seeks to hold it directly liable." *Payne*, 309 F.2d at 549. That it was the training center, and not Diamond Jo directly, that was negligent in failing to cure dangerous icy conditions at the program does not remove liability from Diamond Jo; Diamond Jo is still responsible for the negligence of its agent, in this case, the training center. The duty to provide a safe workplace is non-delegable and exists "despite the fact that [the employer] may not own, control or be under a primary obligation to maintain the premises on which [the] employee is injured." *Id.*; *see also Ribitzki v. Canmar Reading & Bates, Ltd. Partnership*, 111 F.3d 658, 662 (9th Cir. 1997) (The duty to provide a safe workplace "extends to providing a safe place to work on the ship of a third party over whom the employer has no control, if that is where the seaman's employer sends him to work."). Therefore, we conclude that Rannals has successfully established a genuine issue of material fact whether the training center's negligence, if found, may be imputed to Diamond Jo.

Second, we believe that Rannals has created a genuine issue of material fact as to whether the training center had constructive notice of the dangerous icy conditions in its driveways and should have cured or eliminated such conditions to reduce the possibility of harm to program attendees on site. In her deposition, Rannals testified that, on Wednesday, January 14, 1998, the day before her accident, it was "icy outside and kind of drizzling," and the temperature was "chilly." J.A. at 138. She further asserted that, on the morning of Thursday, January 15, 1998, when she and her co-workers were preparing to drive to the training center, it was icy, and some of her co-workers "had to scrape the windows" of their rental car. J.A. at 139. Additionally, according to Rannals, when she and her co-workers arrived at the training center at approximately 8:30 a.m., it was "kind of icy on the driveway" of the training center and the surrounding grassy

areas, and the icy conditions at the center remained the same throughout the day until around 4:00 p.m. J.A. at 81. Furthermore, climatological records for January 15, 1998 showed that there was no freezing rain or trace precipitation after 9:00 a.m., giving the training center more than seven hours to cure or eliminate the dangerous conditions without disruption. Lastly, Rannals testified that when class ended at approximately 4:00 p.m. on January 15, 1998, "[i]t was chilly and a little icy outside yet." J.A. at 141. We believe that all of this evidence is sufficient to create a genuine issue of material fact as to whether the training center had constructive notice of the dangerous icy conditions and should have cured or eliminated such conditions to reduce the possibility of harm to program attendees on site.

Third, we believe that Rannals has created a genuine issue of material fact regarding whether the training center's alleged negligence caused her injuries and damages. During her deposition, Rannals testified that she remembered seeing "a thin layer [of ice] . . . where [she] fell." J.A. at 92. Additionally, when asked if "it [was] fair to say that . . . . the only reason [she] fell [was] because [she] slipped on ice," Rannals answered "Yes." J.A. at 96. In sum, in light of Rannals's testimony and the weather conditions on the day of the accident, we also believe that Rannals has created a question as to whether the icy conditions caused her injuries and damages and conclude that Rannals has successfully created a genuine issue of material fact regarding Diamond Jo's liability for the injuries she sustained at the training center on January 15, 1998.

Diamond Jo argues, however, that the district court was correct in concluding that Rannals's negligence claim was barred by the Ohio common-law defense of natural accumulation, which provides that a private party "has no common-law duty to remove or make less hazardous a natural accumulation of ice and snow on private sidewalks or walkways . . . or to warn those who enter upon [its] premises of the inherent dangers presented by natural accumulations of ice and snow." *Brinkman v. Ross*, 623 N.E.2d 1175, 1178 (Ohio 1993). We do not believe that the Ohio common-law